**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:25-cr-74 |
| | : | |
| v. | : | |
| | : | Judge Thomas M. Rose |
| TRYONE PETTY, | : | |
| | : | |
| Defendant. | : | |

**ENTRY AND ORDER DENYING MOTION
TO WITHDRAW DEFENDANT'S WAIVER OF HIS
ANTI-SHUTTLING RIGHTS (DOC. NO. 47)**

Before the Court is Defendant Tyrone Petty's ("Petty") Motion to Withdraw Defendant's Waiver of His Anti-Shuttling Rights (the "Motion")[1] (Doc. No. 47). The Government responded to Petty's Motion on March 26, 2026 (Doc. No. 51), and Petty filed his Reply on April 14, 2026 (Doc. No. 53). For reasons outlined below, the Court **DENIES** Petty's Motion.

Petty is currently before this Court facing prosecution for federal charges of conspiracy to interfere with commerce by robbery, interference with commerce by robbery, and brandishing a firearm during and in relation to a crime of violence. (*See* Doc. No. 6 at PageID 9–11.) Prior to his federal indictment, Petty was in state custody at the Western Regional Jail in Barboursville, West Virginia. (Doc. No. 47 at PageID 95.) On November 10, 2025, the magistrate judge issued a writ of habeas corpus *ad prosequendum*, requesting that the state authorities release Petty so that he

---

[1] As explained in greater detail below, Petty mischaracterizes his Motion as one seeking permission to withdraw his waiver of his anti-shuttling rights. (*See generally* Doc. No. 47.) By requesting to remain in federal custody, a defendant invokes, rather than waives, his anti-shuttling rights. *See Webb v. Keohane*, 804 F.2d 413, 414 (7th Cir. 1986) ("All the circuits that have reached the issue have held that the rights under [the Interstate Agreement on Detainers] are waived by a prisoner's request to be returned to his original place of imprisonment.").

1

may appear before this Court for his arraignment. (Doc. No. 28 at PageID 49.) Notably, no detainer was ever lodged in this case. (Doc. No. 51 at PageID 108.) On November 13, 2025, Petty appeared before the magistrate judge for his initial appearance and arraignment, and then once again for his detention hearing on November 18, 2025. (*See* Minute Entries, 11/13/2025, 11/18/2025.) At both hearings before the magistrate judge, Petty was advised of his anti-shuttling rights. (*See id.*) And at both proceedings, Petty indicated he wished to remain in federal custody. (*Id.*)

Now, by his Motion, Petty has "indicated his desire to withdraw his [waiver of his] anti-shuttling rights and return to state custody in West Virginia, where he was originally being detained prior to [his federal] indictment." (Doc. No. 47 at PageID 95.) On March 24, 2026, the Court held a hearing on Petty's Motion. (*See* Minute Entry, 3/24/2026.) At that time, Petty's counsel orally amended his Motion, clarifying that Petty originally invoked his anti-shuttling rights but now would like to waive them in order to return to state custody. (*Id.*) The Government opposes Petty's request, arguing Petty was never entitled to anti-shuttling rights to begin with because no detainer was lodged. (Doc. No. 51 at PageID 107–08.) In his Reply, Petty once again mischaracterizes the nature of what transpired at his two hearings before the magistrate judge. (Doc. No. 53 at PageID 112.) Petty submits that when he "waived" his anti-shuttling rights, "his waiver was not made with full awareness of both the nature of the right he was abandoning and the consequences of his decision to abandon it . . . ." (*Id.*) For that reason, according to Petty, his so-called waiver was involuntary, and he should be permitted to withdraw it and return to state custody. (*Id.*) The Court disagrees with Petty for the reasons set forth below.

The Interstate Agreement on Detainers (the "IAD") "creates uniform procedures for lodging and executing a detainer, *i.e.*, a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he

may be tried by a different State for a different crime." *Alabama v. Bozeman*, 533 U.S. 146, 148 (2001). The IAD further "provides for expeditious delivery of the prisoner to the receiving State for trial prior to the termination of his sentence in the sending State[,]" thereby minimizing "the consequent interruption of the prisoner's ongoing prison term." *Id*. To that end, Article III of the IAD sets out the following rule:

> Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint *on the basis of which a detainer has been lodged* against the prisoner, he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition . . . .

18 U.S.C. App. § 2, Art. III (emphasis added). Put simply, when a prisoner is incarcerated in the sending state at the time the Government in the receiving state lodges a detainer against the prisoner, the Government must bring that defendant to trial in the receiving state within 180 days or risk dismissal of the charges brought in the receiving state. In enacting the IAD, Congress's intent was to "remedy the disadvantages and hardships imposed upon prisoners attendant with the use of detainers and to eliminate potential abuses of the detainer system." *United States v. Dixon*, 592 F.2d 329, 333 (6th Cir. 1979).

In outlining the parameters of the IAD, the Supreme Court unambiguously held that the protections of the IAD are triggered as soon as, but only when, a detainer is filed: "Once the Federal Government lodges a detainer against a prisoner with state prison officials, the [IAD] by its express terms becomes applicable and the United States must comply with its provisions." *United States v. Mauro*, 436 U.S. 340, 361–62 (1978). However, "[w]hen the United States obtains state prisoners by means of a writ of habeas corpus *ad prosequendum*, the problems that the [IAD] seeks to eliminate do not arise[,]" and therefore, "a writ of habeas corpus *ad prosequendum* is not a

detainer for purposes of the [IAD]." *Id*. at 361. All that is to say, it is well settled that the IAD and its accompanying protections are only implicated upon the lodging of a detainer, not where the Government merely secures a prisoner's appearance by way of writ. *See Dixon*, 592 F.2d at 333 ("[T]he provisions of the [IAD] are applicable only when a participating jurisdiction, having untried charges pending against a prisoner, first lodges a detainer with the participating jurisdiction where the prisoner is incarcerated.").

In this case, it is undisputed that no detainer was ever lodged against Petty. As mentioned, the mechanism used to secure Petty's appearance before this Court was a writ of habeas corpus *ad prosequendum*. (*See* Doc. No. 28 at PageID 49.) Accordingly, the Government is correct—Petty was never entitled to anti-shuttling rights under the IAD to begin with. For that reason, Petty's argument that he unwittingly waived—or more accurately, invoked—his anti-shuttling rights falls flat, as he cannot waive or invoke rights he was never entitled to in the first place.[2] In short, Petty is to remain in federal custody.

For the reasons stated above, the Court **DENIES** Petty's Motion to Withdraw Defendant's Waiver of His Anti-Shuttling Rights (Doc. No. 47).

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, April 24, 2026.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

---

[2] The Court acknowledges Petty was advised of anti-shuttling rights at his arraignment and detention hearings. (*See* Minute Entries, 11/13/2025, 11/18/2025.) Misadvisement notwithstanding, "[a]ny error, defect, or variance that does not affect substantial rights must be disregarded." FED. R. CRIM. P. 52(a). This rule "prohibits federal courts from granting relief based on errors that 'd[o] not affect substantial rights.'" *Peguero v. United States*, 526 U.S. 23, 30 (1999) (quoting FED. R. CRIM. P. 52(a)). "An error affects the defendant's substantial rights if it was prejudicial, which means the error must have affected the outcome of the district court proceedings." *United States v. Gochis*, 256 F.3d 739, 743 (7th Cir. 2001) (citation and quotation marks omitted). It is axiomatic that a defendant is not prejudiced where he is denied a right to which he was never entitled. The Court therefore does not find its error to be dispositive of the outcome of Petty's Motion.